1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

BRIAN SEWELL,

No.  2:18-cv-2988 DB P

12

Plaintiff,

13

v.

ORDER AND FINDINGS AND
RECOMMENDATIONS

14

A. CORNWELL, et al.,

15

Defendants.

16

17    Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights

18  action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges defendants were deliberately indifferent to

19  his serious medical needs.  Before the court is defendants' motion for summary judgment.  For

20  the reasons set forth below, the court will recommend defendants' motion be granted.

21                                          **BACKGROUND**

22    This case is proceeding on plaintiff's complaint filed here on November 15, 2018.

23  Plaintiff contends that in November 2017 he swallowed medication wrapped in rubber gloves,

24  "bindles" of medication.  He informed defendant Cornwell, a correctional officer, several times

25  that he had swallowed the bindles and was experiencing chest and abdominal pain.  Cornwell did

26  not help plaintiff at first.  Eventually, Cornwell took plaintiff to the triage and treatment area.

27  There, plaintiff told defendant Kendal, a nurse, the same things.  Kendal gave plaintiff a laxative

28  and heartburn medication.  About two hours later, after plaintiff pleaded with Kendal for medical

1

1    help, Kendal contacted a doctor who told Kendal plaintiff should be taken to a hospital.  It was

2    several hours before plaintiff was taken to a hospital.  Once there, a doctor informed plaintiff that

3    too much time had passed to attempt to remove the bindles orally because plaintiff's stomach

4    acids would have weakened the plastic covering the medications. Therefore, the only option was

5    to have the bindles surgically removed.  Plaintiff then had surgery.  His recovery was lengthy and

6    he was in significant pain.

7            Defendants answered the complaint on April 15, 2019.  (ECF No. 17.)  On January 31, 2020,

8    they filed the present motion for summary judgment.  (ECF No. 36.)  Plaintiff filed an opposition

9    (ECF No. 38) and defendants filed a reply (ECF No. 41).

10                          **MOTION FOR SUMMARY JUDGMENT**

11   **I.  Summary Judgment Standards under Rule 56**

12           Summary judgment is appropriate when the moving party "shows that there is no genuine

13   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

14   Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of

15   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litigation, 627

16   F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The

17   moving party may accomplish this by "citing to particular parts of materials in the record,

18   including depositions, documents, electronically stored information, affidavits or declarations,

19   stipulations (including those made for purposes of the motion only), admissions, interrogatory

20   answers, or other materials" or by showing that such materials "do not establish the absence or

21   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

22   support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

23           When the non-moving party bears the burden of proof at trial, "the moving party need

24   only prove that there is an absence of evidence to support the nonmoving party's case."  Oracle

25   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B).

26   Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

27   against a party who fails to make a showing sufficient to establish the existence of an element

28   essential to that party's case, and on which that party will bear the burden of proof at trial.  See

1    <u>Celotex</u>, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

2    nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u>  In such a

3    circumstance, summary judgment should be granted, "so long as whatever is before the district

4    court demonstrates that the standard for entry of summary judgment . . . is satisfied."  <u>Id.</u> at 323.

5          If the moving party meets its initial responsibility, the burden then shifts to the opposing

6    party to establish that a genuine issue as to any material fact actually does exist.  <u>See Matsushita</u>

7    <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the

8    existence of this factual dispute, the opposing party typically may not rely upon the allegations or

9    denials of its pleadings but is required to tender evidence of specific facts in the form of

10   affidavits, and/or admissible discovery material, in support of its contention that the dispute

11   exists.  <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>Matsushita</u>, 475 U.S. at 586 n.11.  However, a complaint that

12   is submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified

13   complaint" and may serve as an opposing affidavit under Rule 56 as long as its allegations arise

14   from personal knowledge and contain specific facts admissible into evidence.  <u>See</u> <u>Jones v.</u>

15   <u>Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004); <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 (9th Cir.

16   1995) (accepting the verified complaint as an opposing affidavit because the plaintiff

17   "demonstrated his personal knowledge by citing two specific instances where correctional staff

18   members . . . made statements from which a jury could reasonably infer a retaliatory motive");

19   <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987); <u>see also</u> <u>El Bey v. Roop</u>, 530 F.3d

20   407, 414 (6th Cir. 2008) (Court reversed the district court's grant of summary judgment because

21   it "fail[ed] to account for the fact that El Bey signed his complaint under penalty of perjury

22   pursuant to 28 U.S.C. § 1746.  His verified complaint therefore carries the same weight as would

23   an affidavit for the purposes of summary judgment.").  The opposing party must demonstrate that

24   the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

25   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

26   could return a verdict for the nonmoving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

27   242, 248 (1986).

28   ////

1     To show the existence of a factual dispute, the opposing party need not establish a

2   material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be

3   shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

4   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

5   Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

6   order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (citations

7   omitted).

8     "In evaluating the evidence to determine whether there is a genuine issue of fact," the

9   court draws "all reasonable inferences supported by the evidence in favor of the non-moving

10   party."  Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the

11   opposing party's obligation to produce a factual predicate from which the inference may be

12   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

13   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

14   party "must do more than simply show that there is some metaphysical doubt as to the material

15   facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

16   nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

17   omitted).

18   **II. Eighth Amendment Claims**

19     Plaintiff alleges defendants Cornwell and Kandel delayed in getting him to a hospital,

20   resulting in hours of "excruciating pain" and eventually surgery to have the bindles of medication

21   removed.  Plaintiff contends that his condition was a "life threatening emergency" which

22   defendants treated with deliberate indifference.

23     **A.  Legal Standards**

24     The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

25   Const. amend. VIII.  The unnecessary and wanton infliction of pain constitutes cruel and unusual

26   punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

27   Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

28   Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy

1   and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited

2   by the Cruel and Unusual Punishments Clause." Whitley, 475 U.S. at 319.

3       What is needed to show unnecessary and wanton infliction of pain "varies according to

4   the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992)

5   (citing Whitley, 475 U.S. at 320). In order to prevail on a claim of cruel and unusual punishment,

6   however, a prisoner must allege and prove that objectively he suffered a sufficiently serious

7   deprivation and that subjectively prison officials acted with deliberate indifference in allowing or

8   causing the deprivation to occur. Wilson, 501 U.S. at 298-99.

9       For an Eighth Amendment claim arising in the context of medical care, the prisoner must

10   allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to

11   serious medical needs." Estelle, 429 U.S. at 106. An Eighth Amendment medical claim has two

12   elements: "the seriousness of the prisoner's medical need and the nature of the defendant's

13   response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on

14   other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

15       A medical need is serious "if the failure to treat the prisoner's condition could result in

16   further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974

17   F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include

18   "the presence of a medical condition that significantly affects an individual's daily activities." Id.

19   at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the

20   objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S.

21   825, 834 (1994).

22       If a prisoner establishes the existence of a serious medical need, he must then show that

23   prison officials responded to the serious medical need with deliberate indifference. See Farmer,

24   511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny,

25   delay, or intentionally interfere with medical treatment, or may be shown by the way in which

26   prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th

27   Cir. 1988).

28   ////

5

Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835.

Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful.  See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

Finally, mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim.  See Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

### B.  Material Facts

Defendants filed a Statement of Undisputed Facts ("DSUF") as required by Local Rule 260(a).  (ECF No. 36-3.)  Plaintiff's filing in opposition to defendant's motion for summary judgment fails to comply with Local Rule 260(b).  Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed

6

Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial." Plaintiff's opposition to the summary judgment motion consists of a brief and a declaration.

In light of plaintiff's pro se status, the court has reviewed plaintiff's filings in an effort to discern whether he denies any material fact asserted in the DSUF or has shown facts that are not opposed by defendants. The court also considers the statements plaintiff made in his verified complaint and of which he has personal knowledge. This process has proved difficult in this case because plaintiff's allegations have not been consistent.

### 1. Plaintiff's Allegations

The court has attempted to determine just what plaintiff alleges happened in each of three documents provided here – the complaint, plaintiff's opposition to the summary judgment motion, and portions of plaintiff's deposition transcripts provided by plaintiff.

### a. Allegations of the Complaint

In his complaint, plaintiff alleged that at "about 6:00 p.m." on November 23, 2017, he notified defendant Cornwell, a correctional sergeant, that he was having severe abdominal pain and informed Cornwell that he had swallowed bindles of the drug Remeron. Plaintiff contends Cornwell did not treat the information seriously. Eventually, after plaintiff made additional requests for medical help, plaintiff was seen by a nurse around 7:00 p.m. Plaintiff told the nurse the same thing he had told Cornwell.

At about 7:15 p.m., plaintiff was taken to the Triage and Treatment Area ("TTA"). (ECF No. 1 at 5.) There, he was seen by defendant Kandel, a registered nurse. Plaintiff contends that he told Kandel at that time that he had swallowed Remeron tied into a rubber glove. Kandel then gave him three different laxatives and heartburn medication. (Id. at 6.)

According to plaintiff, by 9:00 p.m., the bindles had not been expelled. He pleaded with Kandel to let him see a doctor. Kandel then contacted a doctor who told her plaintiff needed to be taken to a hospital. (ECF No. 1 at 6.)

////

Plaintiff alleges that the ambulance did not arrive until after 11:30 p.m.  He was then taken to a hospital over two hours away, rather than to a closer hospital.  Plaintiff alleges Kandel was responsible for that decision.  He arrived at "Stockton County General Hospital" at 2:00 a.m. and immediately had an X-ray.  (ECF No. 1 at 6.)

Doctors determined that surgery was plaintiff's best option.  They told plaintiff that too much time had passed to attempt to remove the bindles orally.  The doctors were concerned that plaintiff's stomach acids would have broken down the rubber gloves, which meant that the chances they might break open were greater.  Doctors then successfully removed the bindles surgically.  Plaintiff had a great deal of pain in recovery from the surgery.  (ECF No. 1 at 8-9.)

### b. Allegations in Plaintiff's Opposition

In his opposition, plaintiff initially states that he was sent back to his cell three times after telling defendants about his stomach pain and that he had swallowed bindles of Remeron.  (ECF No. 38 at 6.)  While not entirely clear, plaintiff appears to be referring to the timeline set out in his complaint – that he informed Cornwell around 6:00 p.m. and nothing was done.  That around 7:00 p.m., a nurse took his vital signs and returned him to his cell.  And that after he saw defendant Kandel around 7:15 p.m. in the TTA, he was returned to his cell with laxatives that did not work.

However, plaintiff also indicates that he told Kandel much earlier than 7:15 p.m. that he had swallowed the bindles.  He contends that after he told Kandel about swallowing the bindles, she first prescribed laxatives and, after they were unsuccessful, she prescribed an enema, which was also unsuccessful.  According to plaintiff, the enema caused his buttocks to become raw and caused him to have a bloody stool.  (ECF No. 38 at 5.)

Plaintiff states that over sixteen hours passed between the time he first reported abdominal pain "due to swallowing bindles of medication" and the time he arrived at the hospital.  (ECF No. 38 at 10.)  It is unclear in this statement whether plaintiff is alleging sixteen hours passed since he reported just the abdominal pain or whether he is alleging sixteen hours passed since he reported both abdominal pain and that he had swallowed the bindles of medication.

////

8

Plaintiff then states that the medical records show that he was prescribed laxative medications starting at 6:45 a.m. in order to "assist in passing the bindles through my system." (ECF No. 38 at 14.)  While he does not directly state that he told Kandel about swallowing the bindles at that time, that is the logical inference from his statement.

Plaintiff repeatedly states that he spent two and a half hours in the ambulance to get to the hospital.  (ECF No. 38 at 5, 11, 12, 15.)  However, plaintiff also admits that he arrived at the hospital at 10:23 p.m., as reflected in the hospital records.  (Id. at 15, 26.)  Plaintiff again states that he had an X-ray immediately upon his arrival at the hospital.  (Id. at 6.)  Hospital records attached to plaintiff's opposition do not indicate plaintiff had an X-ray.  Rather, they show that at 2:00 a.m. on November 24, 2017, plaintiff had a CT scan that revealed foreign objects in his abdomen.  (Id. at 27.)

### c. Plaintiff's Deposition Testimony

Plaintiff attached portions of his deposition transcript to his opposition.  He described his claim against defendant Cornwell as follows:

> When I expressed to him that I had swallowed the medication on a suicide attempt, he laughed about it and he didn't want to call the medical code at first.  And then he called it, and then I seen the nurse.
>
> And he rushed me out of the nurse's office and put me back in my cell.  And then after that, or a little bit past, I told the floor officer that I was having the same problems.  I swallowed the medication and I was having chest problems and my stomach was hurting.  [Cornwell] . . . came back and he kind of joked and said if he calls another medical code he's gonna get me for manipulating housing and manipulating staff.  And I was just kind of like, "Something's wrong.  I got to go to the hospital."

(ECF No. 38 at 33.)  Plaintiff testified that Cornwell then sent him to the TTA.

He described his claim against defendant Kandel as what happened when he got to the TTA.  He told her the same story.  First, she gave him a laxative that "just came right out of me."  Then, she gave him two or three enemas and "that made my butt raw."  (ECF No. 38 at 33.)

When asked at his deposition whether the first time he told Cornwell that he had swallowed medication was around 6:00 p.m., plaintiff testified that was not correct.  He contends

////

9

1   that he told Cornwell "the whole time" that he had swallowed medication.  According to plaintiff,

2   that was why he was sent to the TTA.  (ECF No. 38 at 35.)

3          He testified that the first person he told about swallowing the medication was floor staff.

4   They notified Cornwell and he took plaintiff to the "first nurse."  (ECF No. 38 at 35.)  He also

5   states that he told Kandel from the beginning that he had swallowed medication.  (Id.)  However,

6   she chose to attempt to have plaintiff pass the bindles using laxatives and enemas.  When those

7   did not work, and as a "last resort," Kandel contacted the hospital at about 9:00 p.m.  (Id.)

8          Plaintiff also testified that he did not tell Kandel that he had swallowed the bindles seven

9   days prior.  (ECF No. 38 at 35.)  He did not recall what he told the hospital.  (Id.)

10          With respect to the variations between his complaint and his deposition testimony,

11   plaintiff testified that he did the best he could and might have "got the date and times mixed up."

12   (ECF No. 38 at 36.)

### 2.  Undisputed Material Facts

14          This court has attempted to discern the undisputed material facts.  Where plaintiff appears

15   to have conceded some facts – for example, he admits he arrived at the hospital at 10:23 p.m., as

16   reflected by hospital records, not at 2:00 a.m. as he originally alleged – the court considers those

17   to now be undisputed.  Disputed facts are addressed in the discussion of plaintiff's claims.

18          • Plaintiff is a state prisoner who was incarcerated at CSP-Solano in 2017.  (DSUF #

19              1.)

20          • Defendants were employed at CSP-Solano in 2017.  Defendant Cornwell was a

21              correctional sergeant.  Defendant Kandel was a registered nurse.  (DSUF # 2.)

22          • On November 23, 2017,[1] plaintiff was seen by a nurse at 6:27 a.m.  According to

23              the nurse's notes, plaintiff told the nurse his "stomach is burning and going up my

24              throat and it's worser at night."  (ECF No. 36-3 at 35.[2])  The nurse called the

25              Triage and Treatment Area ("TTA").  (Id. at 36.)

26  _____

[1] Unless otherwise noted, all times herein occurred on November 23, 2017.

27

28  [2] Defendants submitted copies of plaintiff's medical records as attachments to the DSUF.  (ECF
No. 36-3.)

- At 6:38 a.m., plaintiff arrived in the TTA and was seen by defendant Kandel. (ECF No. 36-3 at 62.)

- At 6:50 a.m., Kandel telephoned Dr. Win.  She reported that plaintiff had "epigastric pain and heartburn."  Dr. Win ordered a laxative/stool softener.  (ECF No. 36-3 at 22, 62.)

- At 7:00 a.m., Kandel gave plaintiff a fleet enema and a "GI cocktail."  (ECF No. 36-3 at 63.)

- At 7:31 a.m., Kandel noted that neither the enema nor the GI cocktail had worked. Kandel contacted Dr. Win again and he prescribed Magnesium Citrate, a laxative. Plaintiff was given the Magnesium Citrate at that time.  (ECF No. 36-3 at 22, 35, 63.)

- At 8:57 a.m., Kandel recorded that plaintiff was not getting relief from the Magnesium Citrate.  Kandel's notes reflect that plaintiff had:  "Acid reflux; Asthma; Constipation; Epigastric Discomfort."  Kandel again contacted Dr. Win. He prescribed another fleet enema.  (ECF No. 36-3 at 27, 63.)

- At 11:25 a.m., plaintiff reported to medical staff that he had stomach pains and blood in his urine.  (ECF No. 36-3 at 26, 31-32.)

- At 3:09 p.m., plaintiff was again seen in the TTA.  He was seen by non-party nurse DeLa Vega.  Plaintiff complained that his pain level was now a 10 on a scale of one to ten, and that he had aching and cramping in the right lower abdomen. Plaintiff told the nurse "maybe I should go out."  According to DeLa Vega's notes, she reminded plaintiff that he was scheduled for an x-ray the following Monday; plaintiff then stated, "maybe I swallowed something."  According to her notes, DeLa Vega asked plaintiff three times if he had swallowed a foreign body or inserted something into his rectum, but each time plaintiff "vehemently denied doing this."  (ECF No. 36-3 at 47-48.)

////

////

11

- Sometime between 6:00 p.m. and 6:50 p.m.,[3] plaintiff informed prison staff that his abdominal pain was severe and that he had swallowed bindles of drugs.  In his report, defendant Cornwell states that he was informed by staff at 6:50 p.m. and at 6:54 p.m. he summoned medical help.  (ECF No. 36-3 at 11.)  Cornwell's notes also reflect that plaintiff told staff he had swallowed the bindles five days prior.

- Shortly after 7:00 p.m., plaintiff was seen by nurse DeLa Vega.  The nurse reported that plaintiff admitted swallowing Remeron "five days ago."  (ECF No. 36-3 at 49-50.)  Plaintiff does not dispute this report.

- A medical note entitled "Trauma" shows that Kandel contacted the RN supervisor at 7:04 p.m.  She then called Dr. Win at 7:10 p.m.  At 7:20 p.m., she called emergency medical services ("EMS").  (ECF No. 36-3 at 62.)  A transfer form shows that plaintiff was ordered transferred to San Joaquin General Hospital ("SJGH") at 7:20 p.m.  (Id. at 51.)

- In a note authored by Dr. Win at 8:25 p.m., Win states that plaintiff was seen in the TTA again at about 7:40 p.m.  Plaintiff stated that he had swallowed a "couple" Remeron tablets placed in a glove and that his "epigastric" pain was "up to 7/10."  Dr. Win's notes reflect that plaintiff's case was discussed with "San Joaquin General Hospital ER Dr. Boner."  (ECF No. 36-3 at 26.)

- Plaintiff departed from CSP-Solano in an ambulance at 9:00 p.m.  (ECF No. 36-3 at 51.)

- Plaintiff arrived at SJGH at 10:23 p.m. and was evaluated at that time.  (ECF No. 38 at 26;[4] ECF No. 36-3 at 82.)

////

////

---

[3] In his complaint, plaintiff states that he told Cornwell about his abdominal pain and swallowing the bindles at "around 6:00 p.m."  (ECF No. 1 at 5.)  Cornwell's report states that he learned of that plaintiff had swallowed drug bindles from other staff at 6:50 p.m.  (ECF No. 36-3 at 11.)

[4] Plaintiff attaches copies of some of his medical records to his opposition brief.  (ECF No. 38.)

12

- Plaintiff told SJGH staff that he was suffering from "constipation" and "bloody stool." He informed SJGH staff that he had swallowed the drug Remeron wrapped in "plastic" "seven days ago." (ECF No. 36-3 at 82.)
- At 2:00 a.m. on November 24, 2017, plaintiff had a CT scan at SJGH that revealed "high density structures in the gastric antrum." (ECF No. 38 at 27-28.)
- Doctors determined that it would be safer to remove the bindles surgically rather than orally due to the "risk of perforation and the patient overdosing." (ECF No. 36-3 at 88.)
- On November 24, 2017, plaintiff had surgery in which the bindles were successfully removed. (ECF No. 36-3 at 88.)

**C. Analysis of Eighth Amendment Claims**

    **1. Claim against Correctional Sergeant Cornwell**

Plaintiff describes only one time period during which Cornwell was involved. As set out in his complaint, plaintiff alleges that at about 6:00 p.m., he informed Cornwell about his stomach pain and having swallowed the bindles. However, Cornwell did not take plaintiff's concerns seriously and threatened to write plaintiff up if he continued to "manipulate staff." After some period of time that could not have exceeded an hour, plaintiff was seen by a nurse and very shortly thereafter, Kandel contacted Dr. Win and called for an ambulance.

Even giving plaintiff the benefit of the doubt and assuming he first contacted Cornwell at 6:00 p.m., the delay in getting nursing care was only one hour. And, even assuming plaintiff was experiencing a life-threatening emergency, he fails to show that Cornwell should have known that was the case. Cornwell was a correctional sergeant. Nothing in the record indicates he had any medical training and should have been aware that plaintiff, who had received medical care numerous times that day, was experiencing an emergency that required immediate attention.

When considering the facts in the light most favorable to plaintiff, he cannot establish that Cornwell deliberately delayed obtaining medical care with the knowledge that such delay could cause plaintiff harm. Plaintiff fails to establish deliberate indifference by Cornwell and Cornwell is entitled to summary judgment on plaintiff's Eighth Amendment claim against him.

13

### 2. Claim against Registered Nurse Kandel

Plaintiff now contends that he informed Kandel each time he saw her that his abdominal pain was due to having swallowed the bindles.  However, as set out above, plaintiff has not been consistent in that contention and it is belied by prison medical records.  Those records, from multiple sources, show that plaintiff did not inform any medical staff that he had swallowed the bindles until 7:00 p.m. when he was seen by a non-party nurse.  Notations made prior to 7:00 p.m. by Kandel, nurse DeLa Vega, and Dr. Win make no mention that plaintiff had swallowed the bindles.  Further, DeLa Vega's notes show that plaintiff told her at 3:00 p.m. that he "may" have swallowed something, but backed off from that statement when DeLa Vega pressed him for details.

No reasonable jury would believe plaintiff's belated attempt to change the timing of events over plaintiff's original story and the medical records.  "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."  See Range Road Music Inc. v. East Coast Foods, Inc.,  No. CV 09-2059 CAS (AGRx), 2010 WL 11527426, *4 (C.D. Cal. Mar. 18, 2010) (citation omitted), aff'd, 668 F.3d 1148 (9th Cir. 2012); cf. Scott v. Harris, 550 U.S. 372, 380 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Weston v. Harrigan, 359 F. App'x 868, 870 (9th Cir. 2009) ("A court does not have to accept as true allegations that are contradicted by the record and which no reasonable jury would believe." (citation omitted).)

A reasonable construction of the material facts shows no genuine dispute.  Once Kandel was informed that plaintiff had swallowed the bindles, she immediately contacted her nursing supervisor, Dr. Win, and the ambulance company.  While plaintiff complains that his situation was not deemed an emergency, he fails to show that Kandel bore any responsibility for the length of time it took the ambulance to arrive or for selecting the hospital to which plaintiff was taken.  Moreover, plaintiff significantly overstates all of those time periods.  He claimed that he did not leave in the ambulance until about 11:30 p.m.  However, prison records show he left at 9:00 p.m.

14

1    Further, he admits that he arrived at the hospital at 10:23 p.m., as shown by hospital records.

2           To the extent plaintiff contends that the actions taken at the hospital demonstrated the

3    emergency nature of his situation, that contention is not supported by the hospital records, which

4    plaintiff does not dispute.  Hospital intake notes show that plaintiff informed staff when he

5    arrived that he had swallowed Remeron seven days prior.  However, plaintiff did not have a CT

6    scan to identify the location of the bindles until 2:00 a.m., well over three hours after he arrived.

7    Plaintiff then had surgery sometime on November 24, 2017.  Hospital records do not reveal what

8    time the surgery occurred, but it was sometime after 2:00 a.m.  This timeline does not show, as

9    plaintiff asserts, that hospital staff felt plaintiff's situation was so dire that he required immediate

10   attention.

11          This court also notes that in his complaint, plaintiff appeared to argue that the prison's

12   delay in getting him to the hospital resulted in the necessity that he have surgery.  Of course, the

13   fact that plaintiff told hospital staff he swallowed bindles seven days prior led the hospital doctors

14   to conclude too much time had passed and surgery was the best option.  Plaintiff appears to

15   recognize that fact now.  In his opposition, he identifies his injury as being forced to suffer pain

16   during the time period before arriving at the hospital.

17          Even if this court considered as true plaintiff's allegation that he told Kandel about

18   swallowing the bindles early in the day, plaintiff fails to show that Kandel bore responsibility for

19   the treatment decisions made.  The medical records show, and plaintiff does not dispute, that

20   Kandel contacted Dr. Win each time plaintiff visited the TTA.  Dr. Win, not Kandel, then

21   prescribed the laxatives and enemas.  Moreover, plaintiff fails to show those decisions were

22   medically inappropriate.  Plaintiff alleges that ambulance staff and a doctor at the hospital

23   expressed concern that plaintiff had not been taken in earlier.  Even if that was true, a difference

24   of opinion between doctors does not demonstrate deliberate indifference.  See Toguchi v. Soon

25   Hwang Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).

26          The record before the court shows that plaintiff was seen multiple times in the TTA on

27   November 23, 2017.  Each time plaintiff saw defendant Kandel, she contacted a doctor in an

28   attempt to help with plaintiff's complaints of abdominal pain, constipation, and heartburn.  While

15

1    those treatments may have been unpleasant and even painful, there is no indication they were

2    medically inappropriate or the result of deliberate indifference to plaintiff's health.  As soon as

3    medical staff were informed that plaintiff had swallowed the bindles of drugs, an ambulance was

4    contacted and plaintiff was sent to a hospital.  Hours after he arrived there, plaintiff had surgery

5    that successfully removed the bindles.  Nothing before the court indicates that had plaintiff been

6    taken to the hospital sooner, the result would have been any different.

7         When plaintiff is given the benefit of every factual doubt, he fails to put forth a basis to

8    find Kandel was deliberately indifferent to his medical needs.  Summary judgment should be

9    granted in favor of Kandel.

10        For the foregoing reasons, the Clerk of the Court IS HEREBY ORDERED to randomly

11   assign a district judge to this case; and

12        IT IS RECOMMENDED that defendants' motion for summary judgment (ECF No. 36) be

13   granted.

14        These findings and recommendations will be submitted to the United States District Judge

15   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

16   after being served with these findings and recommendations, either party may file written

17   objections with the court.  The document should be captioned "Objections to Magistrate Judge's

18   Findings and Recommendations."  The parties are advised that failure to file objections within the

19   specified time may result in waiver of the right to appeal the district court's order.  Martinez v.

20   Ylst, 951 F.2d 1153 (9th Cir. 1991).

21   Dated:  April 29, 2020

22

23

24   DLB:9
     DLB1/prisoner-civil rights/sewe2988.msj fr

25

26

27

28

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

16